**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF MICHIGAN**

**SOUTHERN DIVISION**

REMA VASSAR, Ph.D.,
Plaintiff,
v.
BRIAN QUINN; DAN KELLY; DIANNE BYRUM; BRIANNA SCOTT; KEVIN GUSKIEWICZ; REBECCA BAHAR-COOK; STEFAN J. FLETCHER; and JOHN/JANE DOES 1-10, each in their individual capacities; and BRIANNA SCOTT, in her official capacity as Chair of the Board of Trustees, THE MEMBERS OF THE MICHIGAN STATE UNIVERSITY BOARD OF TRUSTEES, in their official capacities, and STEFAN J. FLETCHER, in his official capacity as Secretary and Chief of Staff to the Board of Trustees, for prospective relief only,
Defendants.
____________________________________/

Case No. ________________

Hon. ________________

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Dr. Rema Vassar, by and through her co-counsel, Marko Law, PLLC and Mavacy PLLC, states as follows for her Complaint against Defendants:

**I. INTRODUCTION**

1. This is a civil rights action under 42 U.S.C. § 1983 brought by Dr. Rema Vassar, an elected Trustee of Michigan State University and the first Black woman to chair its Board of Trustees in the University's 168-year history, against the individual University officials and trustees who orchestrated a campaign of intentional discrimination and retaliation against her.

2. Dr. Vassar spoke, as an elected official, on matters of the highest public concern: release of the withheld Larry Nassar investigation documents, transparency and accountability following

the February 13, 2023 campus shooting, the University's treatment of Black students, and, on October 24, 2023, the racial and gender bias driving the mounting campaign against her.

3. One day after her October 24, 2023 public statement attributing her treatment to race and gender bias, the Board commissioned an outside law firm to investigate her. Within months, Defendants had engineered her exit as Chair, referred her to the Governor for removal from her elected office, stripped her committee assignments and trustee privileges, cut off her contractual indemnification without the Board vote their own policy requires, launched further targeted investigations of her, and orchestrated the withdrawal of her defense counsel in pending litigation.

4. The investigators' own report dismissed the most serious allegations against Dr. Vassar, finding no personal benefit, no undue influence, and no harm to the University, and described her asserted bylaw violations as unintentional. Yet Defendants referred Dr. Vassar to the Governor for removal from office, while the trustee whom the same investigation found to have intentionally disclosed confidential, privileged attorney-client communications received a censure and nothing more. No trustee in the University's history, of any race or sex, has been subjected to the combination of measures Defendants deployed against Dr. Vassar, and the white trustees whose comparable or worse conduct is described below were subjected to none of them.

5. On June 2, 2025, after more than a year of review, the Governor of Michigan declined to remove Dr. Vassar from office. The charges could not withstand neutral scrutiny because they were pretext for discrimination and retaliation. Undeterred, on May 17, 2026, a Board majority adopted, on twelve hours' notice, a revised Code of Ethics and Conduct that conditions the exercise of elected office on signing a loyalty oath, and when Dr. Vassar declined to sign,

automatic sanctions stripped her of the representational functions of her office without notice or hearing. Those sanctions operate today.

6. Dr. Vassar's damages claims rest on Defendants' administrative, executive, unilateral, and extra-board conduct, not on any Board vote or resolution. She brings her damages claims against the Defendants in their individual capacities, and she seeks prospective relief, including restoration of her committee assignments and trustee privileges and an end to interference with her indemnification, against the Chair and members of the Board in their official capacities.

## II. JURISDICTION AND VENUE

7. This action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983, 1985(3), and 1988. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

8. This Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and its equitable powers.

9. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including the dissemination and republication of the stigmatizing publications throughout this District, the 2026 campaign of threats directed to Dr. Vassar at her home in this District, and the protective response to that campaign coordinated with the Detroit Police Department in this District, where Dr. Vassar resides and has suffered a substantial part of the injuries alleged.

## III. PARTIES

10. Plaintiff Dr. Rema Vassar is a resident of Wayne County, Michigan, within this District, a tenured professor of education, and an elected member of the Michigan State University Board

of Trustees serving an eight-year term that commenced January 1, 2021. She served as Chair of the Board from January 11, 2023 until March 2024.

11. Defendant Brian Quinn is, and was at all relevant times, General Counsel of Michigan State University. He acted under color of state law. He is sued in his individual capacity.

12. Defendant Dan Kelly is, and was at all relevant times, an elected Trustee of Michigan State University; he served as Vice Chair during Dr. Vassar's chairmanship and was named Chair on March 4, 2024. He acted under color of state law. He is sued in his individual capacity.

13. Defendant Dianne Byrum is, and was at all relevant times, an elected Trustee of Michigan State University and Dr. Vassar's immediate predecessor as Chair. She acted under color of state law. She is sued in her individual capacity.

14. Defendant Brianna Scott is, and was at all relevant times, an elected Trustee of Michigan State University, and since January 2025 has served as Chair of the Board. She acted under color of state law. She is sued in her individual capacity.

15. Defendant Rebecca Bahar-Cook is, and was at all relevant times, an elected Trustee of Michigan State University. She acted under color of state law. She is sued in her individual capacity.

16. Defendant Stefan J. Fletcher is, and has been since January 2023, the Secretary and Chief of Staff to the Board of Trustees of Michigan State University. The Executive Action Summary accompanying the March 2024 resolution package designated him, together with Defendant Quinn, a Responsible Officer for implementation of the corrective actions against Dr. Vassar. At all relevant times he acted under color of state law. He is sued in his individual capacity for damages and in his official capacity solely for prospective relief.

17. Defendant Kevin Guskiewicz is, and has been since March 2024, the President of Michigan State University. He announced his departure on May 27, 2026 and reversed that decision in July 2026, remaining in office. He acted under color of state law. He is sued in his individual capacity.

18. Defendants John/Jane Does 1 through 10 are individuals, presently unknown to Plaintiff, who personally participated in the retaliatory and discriminatory conduct alleged herein, including the initiation of the FOIA campaign targeting Plaintiff's personal finances and the unauthorized release of investigative materials.

19. The Chair of the Board of Trustees, Trustee Brianna Scott, and the members of the Michigan State University Board of Trustees, identified as the officers with authority to implement the prospective relief sought and to enforce or suspend the 2026 Code described below, are sued in their official capacities solely for prospective declaratory and injunctive relief, as is Defendant Fletcher in his official capacity as the Secretary and Chief of Staff and designated Responsible Officer who administers the Board actions challenged here, under *Ex parte Young*. No damages are sought against any Defendant in an official capacity, and no claim in this Complaint is asserted against Michigan State University or its Board of Trustees as entities.

## IV. FACTUAL ALLEGATIONS

### A. Dr. Vassar's Election and Constitutional Office

20. In November 2020, approximately 2.4 million Michigan voters elected Dr. Vassar to the Michigan State University Board of Trustees for an eight-year term commencing January 1, 2021 and running through January 1, 2029.

21. Trustees of Michigan State University are elected constitutional officers of the State of Michigan under Article VIII, Section 5 of the Michigan Constitution of 1963. Dr. Vassar holds her office by democratic mandate. She receives no salary from the University. Under MCL 168.293, she may be removed from office only upon conviction in impeachment proceedings for the reasons and in the manner set forth in Const. 1963, art. XI, § 7, or by the Governor, and the Governor may remove her only for gross neglect of duty, for corrupt conduct in office, or for other misfeasance or malfeasance in office, and only after service of written notice of the charges against her and an opportunity for a public hearing conducted personally by the Governor.

22. Michigan law has defined the obligations of public office since before the Civil War: all public officers are agents, and their official powers are fiduciary; they are trusted with public functions for the good of the public, to protect, advance, and promote the public's interests, and not their own. *People ex rel. Plugger v. Township Board of Overyssel*, 11 Mich 222 (1863); *see Macomb County Prosecutor v. Murphy*, 464 Mich 149 (2001). A trustee's duty of loyalty therefore runs to the people of Michigan, not to a Board majority, not to an administration, and not to the protection of an institution's public image.

23. From the day she took office, Dr. Vassar advocated for equity, Black student success, survivor communities, and transparency in Board operations.

24. On January 11, 2023, her fellow trustees elected Dr. Vassar Chair of the Board, the first Black woman to hold the position in the University's 168-year history.

**B. The Governance Framework**

25. The Board operates under its Bylaws, its Code of Ethics and Conduct adopted May 15, 2020, and numbered Board policies including BOT Policy 103 (Trustee Conflict of Interest),

BOT Policy 606 (Settlement of Claims and Litigation), and BOT Policy 403 (Trustee Indemnification).

26. BOT Policy 403 provides for indemnification of trustees for legal representation. Indemnification under Policy 403 is invoked by affirmative vote of the Board and, once invoked, may be terminated only by the Board. The General Counsel has no authority to terminate a trustee's indemnification.

27. The Board voted to indemnify Dr. Vassar for her legal representation relating to the investigation described below, and the Board never voted to terminate that indemnification.

28. Code of Ethics Standard 6 prohibits disclosure of confidential information. Code of Ethics Standard 8 expressly prohibits deceit, incivility, intimidation, silencing, and retaliation.

**C. Dr. Vassar's Protected Speech as an Elected Official**

29. At all relevant times, Dr. Vassar spoke as an elected official on matters of public concern. Her speech was not made pursuant to any employment duties owed to the University; she has no employment relationship with the University. Her right as an elected representative to speak on public issues, including criticism of the institution she helps govern, lies at the core of the First Amendment to the United States Constitution. Her advocacy was not merely protected speech; it was the discharge of the fiduciary duty Michigan law imposes on her office.

30. In September 2022, Dr. Vassar publicly objected when the then-Chair removed a voter-suppression resolution from a Board meeting agenda.

31. On and after February 13, 2023, following the mass shooting on MSU's campus, Dr. Vassar led the Board's emergency response and publicly advocated for transparency and student-centered healing.

32. In April 2023, Dr. Vassar publicly advocated for release of more than 6,000 withheld Larry Nassar investigation documents to Michigan Attorney General Dana Nessel. On April 21, 2023, the Board majority voted, over Dr. Vassar's objection, to deny the Attorney General's request. Dr. Vassar continued her advocacy. On December 15, 2023, the Board reversed course and voted to release the documents, the outcome Dr. Vassar had championed for months; the Attorney General publicly stated the release should have happened sooner.

33. Throughout her tenure, Dr. Vassar amplified the concerns of Black students, including members of the Black Student Alliance, who reported racial hostility, racially motivated incidents, and institutional indifference.

34. On October 24, 2023, Dr. Vassar publicly responded to the coordinated campaign described below. She denied the allegations against her, stated that she would not resign, and stated that racial and gender bias infected the manner in which she was being evaluated. That statement, by an elected official alleging discrimination within a public institution, was speech on a matter of public concern.

35. On December 18, 2023, Dr. Vassar wrote to the University seeking an opportunity to respond to the accreditation concerns that Faculty Senate Chair Jack Lipton had raised against her with the Higher Learning Commission.

36. Between February 13 and March 24, 2024, through counsel, Dr. Vassar formally challenged the investigation and report described below: by letters dated February 13 and February 19, 2024; by a rebuttal issued March 6, 2024; by a comprehensive response issued March 17, 2024; and by public statements on March 24, 2024.

**D. Early Hostility and the Groundwork for Retaliation**

37. In January 2023, immediately upon Dr. Vassar's election as Chair, certain trustees moved to change Board rules to eliminate permanent chair elections in favor of a revolving chair system and sought to cut short Dr. Vassar's customary two-year term mid-stream. Dr. Vassar opposed the early termination of her term, not the concept of rotation; Trustee Sandy Pierce shared her opposition. No comparable mid-term rule change had been deployed against any prior Chair. In September 2023, the Board ended permanent chair elections on a split vote. On October 9, 2023, in the middle of the escalating campaign described below, the Board amended Bylaws Article 7, the provision governing Board communications with faculty and staff; the investigators' report nonetheless later invoked the superseded pre-amendment text to sustain findings against Dr. Vassar for earlier conduct.

38. In the summer of 2023, while the University paid for Board leadership's legal representation, Freedom of Information Act requests began targeting Dr. Vassar's personal finances. No other trustee was subjected to comparable financial scrutiny. The identities of those who initiated and authorized these requests are known to Defendants.

39. In September 2023, Trustee Scott's name emerged in connection with the leak of information identifying the complainant in the Mel Tucker matter, and the University began investigating the leak. Dr. Vassar retained The Miller Law Firm, P.C. as independent counsel after the University's posture in that investigation became adversarial. The Jones Day firm's investigation concluded that Dr. Vassar had nothing to do with any leak.

40. Although the Board had voted in early 2023 to release the Quinn Emanuel summary of findings concerning predecessor governance, University officials later blocked Dr. Vassar's own access to Quinn Emanuel materials, denying her the legal resources made available to others.

**E. October 2023: The Coordinated Campaign**

41. On October 20, 2023, Trustee Scott sent a letter to the full Board accusing Dr. Vassar of bullying, abuse of authority, and ethics violations. The letter was provided to The State News before it reached the full Board, and was published and widely circulated. In it, Scott intentionally disclosed confidential, privileged attorney-client communications. The copy of the letter provided to Dr. Vassar's counsel was missing the metadata that would identify its true author or authors, concealing whether the letter was in fact the work of others.

42. The identity of every person who authored, reviewed, edited, or directed the October 20, 2023 letter is presently known only to Defendants. What is known is this: the metadata that would identify the letter's author or authors was stripped from the copy provided to Dr. Vassar's counsel; the letter was published and circulated immediately upon its sending; a synchronized cascade of public resignation demands followed within days; and no allegation against Trustee Scott herself, including the letter's intentional disclosure of privileged communications, was ever investigated.

43. Between October 22 and October 24, 2023, a cascade of public calls for Dr. Vassar's resignation issued within days of one another, including from United States Senator Debbie Stabenow, former Governor James Blanchard, Defendant Byrum, Dr. Vassar's immediate predecessor as Chair, and Lipton as Faculty Senate Chair, while the Governor's office announced it was monitoring. The timing and uniformity of the reaction reflected a coordinated pressure campaign. No comparable campaign has ever been directed at a white trustee of the University over governance disputes.

44. On October 24, 2023, Dr. Vassar publicly refused to resign and attributed the campaign to racial and gender bias.

45. The next day, October 25, 2023, the Board commissioned Miller & Chevalier Chartered, a Washington, D.C. law firm, to investigate Dr. Vassar and Trustee Dennis Denno. The Board commissioned no investigation of Trustee Scott's conduct, including her intentional disclosure of privileged communications and her suspected connection to the Tucker leak, and no investigation of any other trustee.

46. The engagement was formalized through the University's Office of Audit, Risk and Compliance on or about October 30, 2023. OARC set the investigation's scope, expanded it at least twice, and instructed the firm in the conduct of the investigation. The University paid Miller & Chevalier more than $500,000, and on information and belief, per internal documents, more than $2 million.

47. Defendant Quinn participated both in retaining and instructing Miller & Chevalier and, later, in advising the Board on the resulting report and discipline, a conflict of roles that ensured the investigation would serve the campaign rather than the truth.

48. In October 2023, further FOIA requests were filed for Dr. Vassar's personal finances and communications, and a series of press articles singled out Dr. Vassar specifically.

**F. November and December 2023: Escalation to the Accreditor**

49. In November 2023, Lipton, as Faculty Senate Chair, reported Dr. Vassar's conduct to the Higher Learning Commission, the University's accreditor, converting an intra-board governance dispute into a threat to the University's accreditation and a weapon against an individual elected trustee. University leadership, including then-Provost and later Interim President Thomas Jeitschko, participated in the discussions and pressure campaign that produced the referral. In its history, the Board had never before referred anyone to the Higher Learning Commission. On December 1, 2023, Lipton forwarded Dr. Vassar's private communications to Defendant Quinn.

Lipton later sued Dr. Vassar and Trustee Denno in the United States District Court for the Western District of Michigan (Case No. 1:24-cv-1029) in litigation arising from her advocacy; it settled in November 2025.

50. On December 18, 2023, Dr. Vassar sought an opportunity to respond to the accreditation concerns raised against her. She was denied a full opportunity to participate.

51. On December 26, 2023, Trustee Scott sent a further letter to all trustees doubling down on her allegations and characterizing Dr. Vassar's tenure as creating a pattern of violations.

**G. The Investigation's Calculated Unfairness**

52. Dr. Vassar cooperated fully with the investigation, sitting voluntarily for interviews on January 4, January 9, and February 6, 2024, totaling more than fifteen hours.

53. The investigators refused to disclose the scope of the investigation, which grew to more than fifty undisclosed allegations; refused advance notice of interview subject matter; forbade any recording or transcript; confronted Dr. Vassar with unfamiliar documents demanding on-the-spot responses; and refused, by email of February 5, 2024, to provide any of the documents or data on which they relied or the search terms for their demanded forensic examination of her personal cell phone.

54. The investigators relied on anonymous accusers whose identities they refused to disclose and on secretly recorded conversations, and they declined to interview witnesses with direct knowledge favorable to Dr. Vassar, including MSU Foundation Board member Alec McAree, the executive director of the parents group POSSE, and the student whose text messages were used without her knowledge.

55. The investigators omitted from their report the Jones Day investigation's conclusion exonerating Dr. Vassar of the Tucker leak, while leaving the leaking narrative alive in public discourse.

56. Dr. Vassar's counsel documented these defects contemporaneously by letters of February 13 and February 19, 2024.

**H. The February 28, 2024 Report**

57. On Wednesday, February 28, 2024, Miller & Chevalier issued its unsigned report. The report dismissed the most serious allegations against Dr. Vassar, finding no personal benefit, no undue influence, and no harm to the University, and acknowledged that her asserted bylaw violations were unintentional.

58. The report nonetheless recommended referring Dr. Vassar and Trustee Denno to the Governor for potential removal under MCL 168.293, while recommending, for Trustee Scott's intentional violation of Code of Ethics Standard 6, no more than censure.

59. The Board received the report at approximately 10:00 a.m. and it was public by approximately 2:00 p.m. the same day, without the Board vote required for such a release. On information and belief, Defendant Quinn caused or directed the release. The release was an administrative act, not a Board vote. By Friday morning, March 1, 2024, a proposed resolution of removal and censure was already circulating.

**I. March 3 and 4, 2024: The Forced Resignation, Censure, and Referral**

60. On March 3, 2024, hours before the special Board meeting called to act on the report, Dr. Vassar resigned as Board Chair, effective upon election of a new chair. Her resignation was not voluntary in any meaningful sense: it was induced by the intolerable conditions Defendants had created, including the rushed public release of the report, the pre-circulated removal resolution,

and the coordinated campaign that preceded them. She delivered a statement expressing pride in her service and disagreement with the report.

61. On March 4, 2024, at a special meeting, the Board censured Dr. Vassar, Trustee Denno, and Trustee Scott; voted to refer Dr. Vassar and Trustee Denno, but not Trustee Scott, to the Governor for potential removal under MCL 168.293; and named Defendant Kelly the new Chair.

62. The March 2024 resolution package itself separates legislation from punishment. Attachment A contains the prospective, generally applicable measures: onboarding, professional development, and policy revision. Attachments B, C, and D are each captioned as "Corrective actions" for a single named trustee; each names that individual, imposes punishment for past conduct described as violations outlined in the Miller & Chevalier Report, and carries its own sunset date. The Board's own packaging adjudicated individuals; it made no rule. A true and correct copy of the resolution package is attached as **Exhibit 1**.

63. Plaintiff does not seek to impose liability on any Defendant for the act of voting on any Board resolution, including the censure. The censure and the Board's votes are alleged as evidence of Defendants' animus, of the sequence of events, and of disparate treatment. The adverse actions on which Plaintiff's claims rest are the administrative, executive, unilateral, and extra-board acts alleged in Section J below, each of which denied Dr. Vassar a privilege of her elected office or imposed a concrete detriment beyond any expression of the Board's disapproval. In any event, the March 2024 corrective-action resolutions were not legislative acts: the Board's constitutional function is the general supervision of the University, a managerial charge, and the individualized discipline of a single officer for past conduct is adjudication, not policymaking.

**J. The Tangible Deprivations**

64. The March 4, 2024 referral of Dr. Vassar to the Governor under MCL 168.293 invoked the machinery of the State against her elected office itself and forced her to defend her seat for more than a year. The resolution authorized a referral and nothing more. It did not draft the transmittal, characterize the findings to the Governor's office, or press for removal over the following year; those were acts of individuals. The transmission of the referral to the Governor's office, and the advocacy pressed upon that office in support of removal, were administrative implementation, not legislative acts.

65. On February 28, 2024, at approximately 9:15 p.m., within hours of the report's public release and before her counsel could review the report or advise her for the weekend censure proceedings, Defendant Quinn emailed The Miller Law Firm cutting off Dr. Vassar's indemnification under BOT Policy 403, and her attorneys were threatened. No Board vote authorized the cutoff; Quinn acted unilaterally, applying no policy of general application, in a matter in which he was personally conflicted. Only the Board may terminate indemnification once invoked. The Miller Law Firm refused to stand down.

66. The University thereafter refused to pay Dr. Vassar's counsel's invoices, approximately $78,000 to $92,000, forcing the firm to sue; preemptively released the fee lawsuit to the press although no FOIA request had been filed; conditioned settlement of the fee suit on Dr. Vassar personally releasing all claims against the University, with Defendant Quinn terminating settlement negotiations on July 30, 2025 and stating that MSU would not settle unless Dr. Vassar waived all of her claims, the first time, on information and belief, that any trustee has been required to waive claims to receive indemnification; and on August 3, 2025 emailed Dr. Vassar a subpoena for her deposition in the fee litigation. Her counsel were threatened twice during the representation. Each of these was an administrative or litigation act, not a legislative one.

67. Between March 4 and March 29, 2024, Dr. Vassar was stripped of her committee assignments and other trustee benefits and privileges, leaving her only her bare vote. The stripping was not legislation by any measure: the operative attachment was styled “Corrective actions: Trustee Vassar,” named one person, punished past conduct, applied no pre-existing rule, and expired by its own terms. Neither the Bylaws, the 2020 Code of Ethics, nor any numbered Board policy authorized the suspension of an elected trustee from board-related activities, and no such sanction had ever been imposed on any trustee: the Board did not apply a rule; it invented a consequence for one person. The resolution also expressly excluded from its reach the activities and duties assigned to Dr. Vassar in her capacity as an elected official, and it delegated implementation to Executive Officers it named, Defendant Quinn and Defendant Stefan J. Fletcher, Secretary and Chief of Staff to the Board of Trustees. What was implemented exceeded what was voted: over the following weeks, the implementers decided what counted as a board-related activity, cut Dr. Vassar off from briefings, information, and the resources afforded every other trustee, and scripted her participation in meetings, deprivations reaching the very elected-office functions the resolution excluded. Immunity for a vote does not reach discretionary implementation that exceeds the vote, and the implementers, including Defendant Kelly as Chair, were not acting as legislators. These are privileges of Dr. Vassar’s elected office, denied to her and to the voters who elected her.

68. Attachment B expired by its own terms on December 31, 2024. On information and belief, Dr. Vassar nonetheless received no committee or liaison assignments for the 2025 and 2026 terms. Her continuing exclusion therefore rests on no Board vote at all: whoever made the post-expiration assignments, and excluded her from them, acted with no legislative act even arguably in place.

69. In April 2024, OARC opened an investigation of Dr. Vassar over an alleged hand gesture at the March 3, 2024 meeting. The investigation was completed in approximately one week; Dr. Vassar was never interviewed and was offered no counsel. Its results were transmitted to the Board on May 22, 2024 and to the Governor on June 12, 2024, and were released to The State News and the Lansing State Journal although no FOIA request had been filed. The June 12, 2024 transmission of that investigation to the Governor rested on no Board vote at all. No comparable scrutiny has ever been applied to any other trustee's conduct at a Board meeting.

70. By April 11, 2024, Dr. Vassar's remarks at Board meetings were being shortened and managed by Defendant Kelly, requiring her to navigate her own elected office under scripted restraint.

71. On September 26, 2024, the Zausmer firm, the University's outside counsel, withdrew from representing Dr. Vassar in the Tucker and Lipton litigation, citing an irreconcilable conflict with the University's interests, a conflict of the University's own making. The withdrawal, and the ensuing insurance coverage gap, left Dr. Vassar without institutionally backed defense counsel in active litigation arising from her service, an abandonment not visited on any other trustee.

72. University officials blocked Dr. Vassar's access to the Quinn Emanuel materials, denying her legal resources made available to others.

**K. Similarly Situated Trustees Were Treated Differently**

73. Kelly, a white man, participated in the same 8:30 p.m. Gupta settlement Zoom call for which the report faulted Dr. Vassar: the same conduct, in the same meeting, examined in the same report. The report recommended no corrective action against Kelly. He was subjected to no investigation, no referral, no financial scrutiny, and no loss of any privilege. Within days of Dr.

Vassar's forced resignation of the chairmanship, the Board elevated Kelly to the chairmanship she had been driven from. Same conduct, opposite consequences; different race and sex.

74. Defendant Byrum, a white woman and Dr. Vassar's predecessor as Chair, accepted third-party travel without investigation or incident. Moreover, allegations of retaliation during her chairmanship, raised in a letter to alumni by the POSSE parents group, were never investigated. No FOIA campaign ever targeted her personal finances, no outside firm was ever commissioned to investigate her, and she lost no privilege of office.

75. Trustee Sandy Pierce engaged in comparable board-governance conduct, including opposition to the mid-term chair rule change, without investigation or sanction.

76. Trustee Scott, who like Dr. Vassar is an African American woman, is not offered as a racial comparator. Her treatment nonetheless exposes the selectivity and pretext of the machinery deployed against Dr. Vassar. The University's own investigators found that Scott intentionally violated Code of Ethics Standard 6 by disclosing confidential, privileged attorney-client communications, and her name had emerged in connection with the Tucker leak. Yet the Board commissioned no investigation of Scott, and on March 4, 2024 she received a censure and nothing more: no referral to the Governor, no stripping of committee assignments or benefits, no targeted follow-on investigations, no financial scrutiny, and no interference with counsel.

77. Dr. Vassar does not allege that the Board treats every African American woman adversely, and no such allegation is required. The Scott disparity is pled for what it factually demonstrates. Discipline within the Board was inverted relative to the gravity of conduct: the trustee whose misconduct the University's own investigators found intentional received a censure and nothing more, while the trustee whose asserted violations the same investigators found unintentional, and who had publicly attributed her treatment to racial and gender bias,

received the referral, the stripping, the financial targeting, the follow-on investigations, and the interference with counsel. The Board thereby demonstrated that it knew how to confine discipline to a censure and chose not to for Dr. Vassar alone. Defendants' explanation for that inversion, and for the October 25, 2023 decision to investigate Dr. Vassar while investigating no allegation against her accuser, is theirs to give.

78. Measured against Michigan's actual fiduciary standard, the disloyalty in this record is Defendants': an intentional disclosure of privileged communications to the press, a General Counsel who steered an investigation in which he was a percipient witness and then cut off the accused's defense, a two-million-dollar investigation aimed at an accuser's targets but never the accuser, a blame narrative that brought police protection to trustees' homes, and a Code that punishes trustees for serving the public rather than the power structure.

79. Trustee Denno was a co-subject of the same proceedings: investigated, censured, referred to the Governor alongside Dr. Vassar, and made the subject of his own corrective-actions attachment. The Board-voted measures they shared end the similarity. On information and belief, none of the extra-board measures was visited on Denno: no FOIA campaign targeted his personal finances; his indemnification was not cut off; no follow-on conduct investigation was opened against him; his remarks were not scripted; and his institutional defense arrangements were not disrupted.

80. No white trustee, and no male trustee, has ever been subjected to the extra-board campaign deployed against Dr. Vassar: a same-day public release of investigative findings without a Board vote, unilateral termination of indemnification, targeted personal-finance FOIA campaigns, a follow-on conduct investigation transmitted to the Governor without a vote, scripted and shortened remarks, fee litigation conditioned on a release of claims, orchestrated

withdrawal of defense counsel, and exclusion from the Mackinac Policy Conference. And before the report ever issued, the campaign was hers alone: only Dr. Vassar faced the combination of a chair-rule change aimed at her term, FOIA requests into her personal finances, public accusatory letters fed to the press, an accreditor referral, and synchronized resignation demands.

81. To sustain findings against Dr. Vassar, the investigators applied rules that do not exist, including by rewriting the donor exception of the unpublished Trustee Tickets, Travel, and Taxation Guidelines to insert a requirement of a longstanding friendship predating the trustee's role, words that appear nowhere in the policy, while trustees are affirmatively encouraged to cultivate donors and no rule regulates trustee acceptance of third-party travel, trustee contacts with state agencies, or trustee participation in congratulatory award advertisements.

**L. The Governor's Refusal**

82. On June 2, 2025, Governor Gretchen Whitmer declined to remove Dr. Vassar or Trustee Denno from the Board. MCL 168.293 conditions gubernatorial removal on a substantive showing of gross neglect of duty, corrupt conduct in office, or other misfeasance or malfeasance in office, upon written notice of the charges, and upon an opportunity for a public hearing conducted personally by the Governor. In more than a year of review, no hearing was ever convened and no removal occurred. In the one forum in which the charges against Dr. Vassar had to be stated in writing, tested against a substantive standard, and decided personally by a neutral constitutional officer, the accusations did not warrant even the convening of a hearing. The charges collapsed when they met real process because they were never built to survive scrutiny; they were built to punish. Under Michigan law, removal-grade official misconduct is a corrupt breach of the officer's duty of loyalty to the public, the use of office to serve the officer's

interests rather than the public's; Dr. Vassar's conduct was that duty's fulfillment, not its breach. The referral was pretext.

**M. 2026: Dr. Vassar's Continued Speech and the Renewed Campaign**

83. On February 2, 2026, Dr. Vassar published a guest commentary in Bridge Michigan criticizing the University's decision to roll back its diversity, equity, and inclusion programs and calling for their restoration.

84. The University's leadership responded publicly and critically. President Guskiewicz stated that he was disappointed by the essay, and Trustee Scott, by then Chair of the Board, complained publicly that the commentary placed the Board and its work in a negative light.

85. In April 2026, Dr. Vassar, together with Trustees Mike Balow and Dennis Denno, publicly raised concerns regarding the performance of Defendant Quinn as General Counsel. An internal document reflecting those concerns reached The State News, and within hours five trustees, including Defendant Scott and, on information and belief, Defendant Bahar-Cook, issued a joint statement publicly condemning the three dissenting trustees for undermining the norms of Board governance. The same month, Trustees Balow and Denno published an opinion essay in The Detroit News calling for transparency regarding a University investment after the Board blocked their resolution seeking it; Chair Scott described the essay and related interviews as out of bounds.

86. On May 5, 2026, President Guskiewicz emailed the full Board expressing full confidence in Defendant Quinn, branding the trustees' complaints about Quinn a malicious attempt to disparage and defame, asserting that the disclosure of those concerns ran afoul of the ethical standards expected of a university trustee, and declaring the matter not closed. The email was a threat of investigation aimed at the trustees who had spoken, issued by the University's chief

executive to the full Board, and a threat of official investigation in retaliation for protected speech is itself an adverse action capable of chilling a person of ordinary firmness.

87. Each of these statements was speech by elected officials on matters of public concern: the University's programs, its finances, and the performance of its senior legal officer.

**N. The May 17, 2026 Code: A Loyalty Oath for Elected Officials**

88. On Wednesday evening, May 13, 2026, the Office of the General Counsel, which Defendant Quinn leads, circulated to the trustees the draft text of a revised Trustee Code of Ethics and Conduct (the "2026 Code"). The draft received no committee review.

89. On Saturday afternoon, May 16, 2026, a special virtual meeting of the Board was called for the following evening, on approximately twelve hours' public notice.

90. On Sunday, May 17, 2026, at approximately 8:00 p.m., the Board adopted the 2026 Code, a true and correct copy of which is attached as **Exhibit 2**, by a vote of five to three, Dr. Vassar dissenting; she joined the meeting from Egypt at approximately 3:00 a.m. local time. At the same meeting, the Board voted to recommend nearly doubling the President's salary, from approximately $1.03 million to $2.0 million, and extending his contract through 2031.

91. The 2026 Code commits each trustee, among other things, to "support the majority decision of the Board" and not to undermine it; to uphold the University's reputation; to refrain from providing information about the University deemed inaccurate or misleading; and to raise concerns only in settings the Code deems appropriate and in advance of Board action. The commitments restrict dissent while leaving praise of Board decisions untouched.

92. The 2026 Code inverts the Michigan standard. Where Michigan law directs a trustee's loyalty to the public, the Code demands loyalty to the Board majority: support for its decisions, protection of the institution's reputation, and silence outside approved settings. Under the 2026

Code, the conduct Michigan law defines as the trustee's fiduciary duty, bringing the public's business to the public, is the conduct the Code punishes.

93. The 2026 Code requires every trustee to sign a Statement of Acknowledgment "unaltered and unedited" by 5:00 p.m. on Sunday, May 24, 2026, and within seven days of any future amendment. By the Code's own terms, refusal to sign triggers automatic sanctions with no finding of fact, no notice, and no hearing: public censure; loss of athletic and event ticket privileges and suite access; loss of travel reimbursement; removal from ceremonial functions including commencement; loss of speaking platforms; removal from committee chair and vice chair positions; and removal from external liaison assignments. Code violations may be sanctioned up to referral for removal from office.

94. The 2026 Code declares that BOT Policy 403 "is inapplicable" to Code investigations, purporting to strip University-paid indemnification and representation for such investigations, and requires trustees to surrender personal devices on demand. The Board never put Policy 403 itself to a vote. The 2026 Code purports to eliminate, by side-resolution, the indemnification commitment the Board itself invoked for Dr. Vassar in 2023.

95. The 2026 Code may be amended only by a six-vote supermajority of the eight-member Board, and any trustee under a Code investigation or sanction is automatically recused from voting on any amendment that directly impacts that investigation or sanction. Dissent is made self-disqualifying.

96. Presenting the 2026 Code, Chair Scott stated that trustees had been undermining the president, the administration, and Board decisions, and spreading misinformation, and that "that has got to stop," citing trustees' podcasts, op-eds, and email messages, and stating that the

President was frustrated. By its sponsors' own account, the 2026 Code was aimed at the public speech of dissenting elected trustees.

97. That same Sunday, May 17, 2026, Dr. Vassar's counsel transmitted her pre-litigation demand letter to the University. Within approximately forty-eight hours, the University publicly disclosed the pre-litigation correspondence before any substantive response, repeating the pattern of the February 28, 2024 same-day release.

**O. The Sanctions Attach and Continue**

98. Dr. Vassar declined to sign the Statement of Acknowledgment. An elected constitutional officer cannot, consistent with her office and her oath, subscribe under threat of punishment to a loyalty oath she did not draft and cannot edit.

99. At 5:00 p.m. on Sunday, May 24, 2026, the 2026 Code's automatic sanctions attached against Dr. Vassar by operation of the Code, with no notice of the contemplated sanctions, no opportunity to be heard, and no neutral decisionmaker. The contrast with Michigan law is statutory, not rhetorical: under MCL 168.293, an elected trustee cannot suffer even the ultimate sanction of removal without written notice of the charges and a public hearing conducted personally by the Governor, yet the 2026 Code strips the privileges of the same elected office automatically, with no charge, no hearing, and no decisionmaker at all. Trustee Balow, who also declined to sign, was sanctioned as well: the Code's machinery runs against dissenters as such.

100. Among the sanctions implemented, the University revoked the credentials and travel of Dr. Vassar and Trustee Balow for the 2026 Mackinac Policy Conference, the State's principal annual policy gathering, at which an elected trustee participates in her capacity as a constitutional officer. Her exclusion was public and visible to the assembled leadership of the State.

101. On May 27, 2026, President Guskiewicz announced his departure from the University, citing energy spent revisiting past conflicts and internal disagreements.

102. On May 29, 2026, Dr. Vassar's counsel formally requested that the Michigan Attorney General review the 2026 Code's constitutionality and engage the University to pause enforcement, and the Foundation for Individual Rights and Expression separately wrote the Board that the 2026 Code violates the First Amendment and called for its revision. The sanctions remain in effect. Dr. Vassar serves her elected term under an operative loyalty-oath regime, and the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury.

103. President Guskiewicz's departure announcement did not quiet the campaign; it redirected it. His resignation message was transmitted through the University's email system to an audience numbering, on information and belief, in the hundreds of thousands, and publicly attributed his departure to divisions within the Board, which he called an unsustainable situation. Chair Scott then publicly attributed the President's departure to three trustees, the same three who had raised concerns about Defendant Quinn. Dr. Vassar was publicly painted as the primary reason for the President's exit, and for the Athletic Director's June 2026 departure as well. Neither narrative was true.

104. On June 15, 2026, hours after the Athletic Director's departure was announced, the University's head men's basketball coach, among the most influential figures in Michigan public life, told reporters that he could not stand what was going on at the University, called the leadership losses self-inflicted, and declared that "Spartan Nation better stand up, all 600,000 of them," urging the University's 600,000 living alumni to start rallying together. Press accounts reported that his remarks fueled the existing public campaign against the trustees, including

petitions, mass email campaigns, and spreadsheets doxxing trustees' personal information, amid demands for trustees' resignations. The coach is not alleged to have intended what followed. The Defendants who had aimed a false blame narrative at three identifiable elected trustees bear responsibility for its foreseeable consequences.

105. What followed was a wave of threats. Dr. Vassar's name, face, home address, and telephone number were posted across the internet. A social media account published trustees' home addresses. Dr. Vassar received racist and menacing messages, at least one of which a fellow trustee described in writing as sounding like something from the Jim Crow South. Trustee Balow wrote University leadership that his family could not sleep and pleaded for the temperature to be lowered.

106. The danger was serious enough that the University's Department of Police and Public Safety activated a protective action plan: Chief Michael Yankowski briefed every police jurisdiction in which a trustee resides, 9-1-1 centers flagged trustees' home addresses, and special-attention patrols ran for ten days, with the Detroit Police Department's Twelfth Precinct briefed to patrol Dr. Vassar's home. An elected constitutional officer of the State of Michigan required police protection at her home because of a blame campaign University leadership built on a false narrative.

107. In July 2026, after the alumni campaign that his departure announcement and the blame narrative had set in motion, President Guskiewicz reversed course and announced that he would remain as President. The sanctions against Dr. Vassar remained, and remain, in effect throughout.

**P. Personal Involvement of Each Defendant in Non-Legislative Conduct**

108. The following acts of each Defendant were administrative, executive, unilateral, or extra-board in character: enforcement and implementation decisions applied to a single person, unilateral acts taken outside any Board process, communications to third parties and the press, and directives to University staff. None was a vote, a resolution, or deliberation on a measure before the Board.

109. Defendant Quinn personally: served as a named Responsible Officer for implementation of the March 2024 corrective actions and, on information and belief, directed implementation choices exceeding the resolution's terms; participated in retaining and instructing Miller & Chevalier while later advising the Board on the report and discipline; on information and belief, caused or directed the same-day public release of the report without a Board vote; unilaterally cut off Dr. Vassar's indemnification by email of February 28, 2024 at approximately 9:15 p.m., without Board authorization, and her attorneys were threatened; directed or participated in the University's refusal to pay her counsel, the coercive settlement condition, and the litigation tactics against her; and, through the office he leads, drafted and circulated the 2026 Code on May 13, 2026 outside any committee process.

110. Defendant Kelly personally, and apart from any vote: as Chair, implemented and enforced Dr. Vassar's exclusion from committee service, briefings, and trustee resources; shortened and managed her remarks at Board meetings; on information and belief, directed or approved the hand-gesture investigation; and participated in the decisions to condition settlement of the fee suit on Dr. Vassar's release of claims.

111. Defendant Byrum personally: as Dr. Vassar's immediate predecessor as Chair, the trustee displaced when the first Black woman took the position, publicly demanded Dr. Vassar's resignation within the synchronized 48-hour cascade of October 22 to 24, 2023, alongside a

sitting United States Senator and a former Governor, immediately after publication of a letter whose authorship metadata had been stripped. Her demand is pled not as an adverse action in itself but as circumstantial evidence of coordination with Defendant Scott and the campaign's other architects: an overt act in furtherance of the conspiracy alleged in Count IV and evidence of concerted action supporting Count II. On information and belief, Byrum also participated in the coordination of the October 2023 campaign, the direction of the investigation's scope to Dr. Vassar, and the administrative implementation of the measures identified above.

112. Defendant Bahar-Cook personally, and apart from any vote: on information and belief, joined the April 12, 2026 public condemnation of the dissenting trustees, publicly defended the 2026 Code, and participated in the coordination and implementation of the 2026 measures against Dr. Vassar.

113. Defendant Scott personally: authored and published the October 20, 2023 and December 26, 2023 letters outside any Board deliberative process, intentionally disclosing privileged communications, as the University's own investigators later found; the metadata identifying the letters' authorship was stripped before the copy was provided to Dr. Vassar's counsel. As Chair in 2026, Scott presented and championed the 2026 Code, publicly justified it as directed at trustees' public speech, and implemented its automatic sanctions against Dr. Vassar; and, on information and belief, publicly attributed the President's May 2026 departure to the three dissenting trustees, fueling the June 2026 threat wave.

114. Defendant Guskiewicz personally, and apart from any Board vote: publicly criticized Dr. Vassar's February 2, 2026 commentary; pressed for the governance environment the 2026 Code was publicly justified as securing for his leadership; sent the May 5, 2026 email to the full Board branding the dissenting trustees' complaints malicious, declaring the matter not closed, and

threatening investigation of the trustees who had spoken; announced his May 27, 2026 departure in a message transmitted through the University's mass email system publicly attributing his departure to divisions within the Board, statements that, together with Chair Scott's public attribution of his departure to the three dissenting trustees, foreseeably preceded the June 2026 threat wave against Dr. Vassar; and, on information and belief, as President directed or approved the administration's implementation of the 2026 Code's automatic sanctions against Dr. Vassar, including the May 2026 Mackinac credential revocations carried out during his presidency, and participated in the administration's investigative and litigation decisions targeting her, including the April 2024 hand-gesture investigation.

115. Defendant Fletcher personally, and apart from any Board vote: served, with Defendant Quinn, as a designated Responsible Officer under the March 2024 Executive Action Summary for implementation of the corrective actions against Dr. Vassar; administered and effectuated that implementation, including the exclusion from committee service, the cutoff of briefings, information, and trustee resources, and the scripting of her participation, in a manner that exceeded the sanctions voted and reached the elected-office functions the resolution expressly excluded; and, on information and belief, as the officer responsible for administering Board actions, transmitted the Board's referral to the Governor, administers the 2026 Code's Statement of Acknowledgment process, and administers Dr. Vassar's continued exclusion from committee service and representational functions. Each act was administrative and executive, not legislative.

116. On information and belief, John/Jane Does 1 through 10 initiated and authorized the FOIA campaign targeting Dr. Vassar's personal finances, participated in the unauthorized release of the report, and fed false leaking narratives to the press.

**Q. Requests to Clear Her Name**

117. The report and censure publicly branded Dr. Vassar's conduct as violations warranting removal from elected office, charges stigmatizing to her honesty and professional standing. Dr. Vassar sought opportunities to respond and clear her name, including the December 18, 2023 letter regarding the accreditation charges and her counsel's February and March 2024 letters, rebuttal, and response. No name-clearing hearing was ever provided.

**R. Harms**

118. As a direct and proximate result of Defendants' conduct, Dr. Vassar has suffered the loss of her chairmanship, her committee assignments, and the privileges of her elected office; more than a year under threat of removal from office; unreimbursed legal expenses; exposure to coerced waiver of her claims; abandonment by institutional defense counsel in active litigation; severe emotional distress and humiliation; and lasting damage to her national professional reputation as a scholar and leader.

119. Dr. Vassar serves out her term through 2029 under the hostile conditions Defendants created, stripped of the privileges her voters elected her to exercise, and since May 24, 2026 subject to an operative loyalty-oath regime that excludes her from the representational functions of her office. In June 2026, a wave of doxxing and racist threats required multi-jurisdiction police protection of her home.

**COUNT I**

**Denial of Equal Protection, Race and Sex Discrimination, 42 U.S.C. § 1983**

**(Including Deprivation of Rights Secured by 42 U.S.C. § 1981, Enforced Through § 1983; Against Defendants Quinn, Kelly, Byrum, Scott, Bahar-Cook, and Does 1-10, in Their Individual Capacities)**

120. Plaintiff realleges and incorporates the foregoing paragraphs.

121. Acting under color of state law, Defendants intentionally discriminated against Dr. Vassar because of her race and sex, subjecting the first Black woman Chair in the University's history to investigation, publicity, sanction, and deprivation imposed on no similarly situated trustee.

122. This Count rests on Defendants' administrative, executive, unilateral, and extra-board conduct alleged above, including the October 25, 2023 selective decision to investigate Dr. Vassar while investigating no allegation against Trustee Scott, the steering and scoping of the investigation to Dr. Vassar, the unauthorized same-day release of the report, the unilateral indemnification cutoff, the personal-finance FOIA campaign, the implementation of her exclusion from committee service and trustee resources, the hand-gesture investigation, the coercive fee-litigation tactics, and the orchestrated withdrawal of her defense counsel. Board votes and resolutions are relied upon only as evidence of intent, sequence, and disparate treatment.

123. The discriminatory purpose is shown by, among other things: the treatment of similarly situated white trustees, Defendant Kelly, whose identical Gupta-call participation drew no investigation, sanction, or scrutiny, and Defendant Byrum, whose third-party travel and chairmanship-era retaliation allegations were never investigated and whose finances were never targeted; the departures from procedural norms, including the mid-term elimination of permanent chair elections upon the ascension of the first Black woman Chair, the same-day release of the report without the required Board vote, and the unilateral indemnification cutoff; the targeting of Dr. Vassar's personal finances through FOIA with no counterpart for any white or male trustee; the calibration of discipline to power rather than conduct, in which the Board demonstrated it

knew how to confine discipline to censure and reserved every tangible deprivation for Dr. Vassar; and the sequence of events culminating within one day of her public complaint of bias.

124. Defendants' interference with Dr. Vassar's rights under BOT Policy 403, a contractual indemnification arrangement, because of her race deprived her of the equal right to make and enforce contracts secured by 42 U.S.C. § 1981, enforced against state actors exclusively through § 1983.

125. In the alternative, Defendants intentionally treated Dr. Vassar differently from similarly situated trustees, including by investigating and sanctioning her while declining to investigate Trustee Scott's documented intentional misconduct, without any rational basis and in order to punish her exercise of constitutional rights.

126. Defendants acted intentionally, maliciously, or with reckless indifference to Dr. Vassar's federally protected rights, and she suffered the damages alleged above.

**COUNT II**

**First Amendment Retaliation, 42 U.S.C. § 1983**

**(Against Defendants Quinn, Kelly, Byrum, Scott, Guskiewicz, Bahar-Cook, Fletcher, and Does 1-10, in Their Individual Capacities)**

127. Plaintiff realleges and incorporates the foregoing paragraphs.

128. Dr. Vassar engaged in constitutionally protected speech as an elected official on matters of public concern, including her Nassar-documents advocacy, her post-shooting transparency advocacy, her advocacy for Black students, her October 24, 2023 public statement attributing her treatment to racial and gender bias, her February and March 2024 challenges to the investigation and report, her February 2, 2026 published commentary, and her 2026 statements concerning the General Counsel's performance.

129. Acting under color of state law, Defendants took adverse actions against Dr. Vassar that would deter an elected official of ordinary firmness from continuing to speak. This Count rests on the tangible, material deprivations alleged in Section J, each administrative, executive, unilateral, or extra-board in character: the commissioning-adjacent steering of a targeted investigation of her beginning one day after her October 24, 2023 statement; the transmission and prosecution of the removal referral; the implementation of her exclusion from committee service, briefings, and trustee resources; the unilateral termination of and interference with her contractual indemnification and her relationship with counsel; the follow-on targeted investigations; the coercive fee-litigation tactics; the orchestrated withdrawal of her defense counsel; and the enforcement against her of the 2026 Code's automatic sanctions, including the Mackinac exclusion. Plaintiff does not rest this Count on the censure or on any Defendant's vote.

130. Each such action denied Dr. Vassar a privilege of her office or imposed a tangible, material detriment; none was a mere expression of colleagues' disapproval.

131. Dr. Vassar's protected speech was a substantial and motivating factor in each adverse action, as shown by the immediate temporal proximity between her October 24, 2023 statement and the October 25, 2023 commissioning of the investigation, the disparate treatment of similarly situated trustees, the procedural irregularities including the same-day release of the report without a Board vote and the pre-circulated resolution, and the Governor's ultimate refusal to act on the referral. Defendants would not have taken these actions absent their retaliatory motive.

132. Defendants acted intentionally, maliciously, or with reckless indifference to Dr. Vassar's federally protected rights.

133. As a direct and proximate result, Dr. Vassar suffered the damages alleged above.

**COUNT III**

**Deprivation of Liberty Without Due Process, Stigma-Plus, 42 U.S.C. § 1983**

**(Against Defendants Quinn, Kelly, Byrum, Guskiewicz, and Does 1-10, in Their Individual Capacities)**

134. Plaintiff realleges and incorporates the foregoing paragraphs.

135. Defendants published stigmatizing charges against Dr. Vassar, branding her conduct as ethics and bylaw violations warranting removal from elected office, through the same-day public release of the report, statements to the press, and the publicity given the referral, and did so in connection with the alteration and extinguishment of tangible rights and statuses: her chairmanship, her committee assignments and trustee benefits, her contractual indemnification, and her institutionally backed legal defense. Each of these was a tangible right, status, or government benefit previously enjoyed, extinguished or altered in conjunction with the stigmatizing publications. Dr. Vassar does not assert a property interest in the elected office itself; the interests deprived are the contractual indemnification the Board had voted to extend to her, the benefits and statuses enumerated above, and her liberty interest in her good name, reputation, honor, and integrity.

136. The charges were false or misleading in material respects, including the leaking narrative that the Jones Day investigation had already disproven.

137. Dr. Vassar repeatedly asserted the falsity of the charges and sought, from the only body with authority over the record, the opportunity to refute them and correct it: publicly on October 24, 2023; on December 18, 2023, when her request for a full opportunity to respond to the accreditation charges was denied; through counsel's February 19, 2024 letter identifying the investigation's methodological defects before the report issued; through the formal Response to the report delivered to the Board on March 6, 2024 and the supplemental Response of March 17,

2024, which refuted the findings point by point; through her March 29, 2024 Statement on Indemnification; and through counsel's May 17, 2026 demand that the Board rescind the March 4, 2024 censure and issue a corrective public statement. On October 19, 2026, through counsel, Dr. Vassar expressly demanded a name-clearing hearing before the Board. Defendants never offered, convened, or permitted any hearing or forum of any kind at which Dr. Vassar could clear her name. They answered each refutation by republishing the accusations: the report was released to the media the day it issued, the Fingergate findings were released to the press with no FOIA request, and the May 17, 2026 demand itself was publicly disclosed within forty-eight hours.

138. The Board maintains no grievance, appeal, or hearing procedure available to an elected trustee. The only hearing-bearing process that exists, removal review under MCL 168.293 with its written charges and personal public hearing before the Governor, was invoked by Defendants themselves and expired without any hearing being convened. There was no established procedure for Dr. Vassar to invoke; the requests described above were everything a request can be in this setting.

139. To the extent the request requirement developed in public-employment cases applies to an elected constitutional officer whom Defendants had no power to terminate and for whom no established hearing procedure exists, Dr. Vassar made the requests described above and they were denied or ignored, and any further request was futile. In the alternative, that requirement, a creature of the employment relationship, does not govern this claim, which proceeds on the stigmatizing publications made in conjunction with the deprivation of benefits previously enjoyed.

140. Defendants thereby deprived Dr. Vassar of liberty without due process of law, causing the damages alleged above.

**COUNT IV**

**Conspiracy to Deprive Equal Protection, 42 U.S.C. § 1985(3)**

**(Against Defendants Quinn, Kelly, Byrum, Scott, and Does 1-10, in Their Individual Capacities)**

141. Plaintiff realleges and incorporates the foregoing paragraphs.

142. Two or more Defendants, including actors outside the Board such as Faculty Senate Chair Lipton, a non-party co-conspirator, and non-University participants, agreed and conspired to deprive Dr. Vassar of the equal protection of the laws, motivated by racial and gender-based invidious animus, as evidenced by the timing, publication, and stripped metadata of the October 20, 2023 letter, the October 22 to 24, 2023 pressure cascade, the pre-circulated resolution, and the synchronized publicity.

143. Defendants committed overt acts in furtherance of the conspiracy, including the letters, Defendant Byrum's synchronized resignation demand within the October 22 to 24, 2023 cascade, the commissioning and steering of the investigation, the unauthorized release, the transmission of the referral, the stripping's implementation, and the indemnification cutoff, injuring Dr. Vassar as alleged above.

**COUNT V**

**Compelled Speech, Prior Restraint, and Denial of Due Process: The May 17, 2026 Code, Facially and As Applied, 42 U.S.C. § 1983**

**(For Declaratory and Prospective Injunctive Relief Against the Official-Capacity Defendants; and for Damages Against Defendants Quinn, Scott, Guskiewicz, Fletcher, and Does 1-10 in Their Individual Capacities for Non-Legislative Implementation)**

144. Plaintiff realleges and incorporates the foregoing paragraphs.

145. The 2026 Code conditions the exercise of an elected constitutional office on subscribing in writing, unaltered and unedited, to commitments not to dissent publicly from Board decisions. It is a loyalty oath, and it demands loyalty to the wrong principal: Michigan law directs a trustee's fiduciary loyalty to the public, not to a Board majority. Compelling it violates the First Amendment's prohibition on compelled speech, and its commitments operate as a prior restraint on the speech of elected officials on matters of public concern. Its restrictions are viewpoint based and content based: praise of Board decisions is untouched, while dissent is presumptively sanctionable.

146. The 2026 Code's automatic sanctions deprive Dr. Vassar of liberty and property interests, including the privileges and representational functions of her elected office and her contractual indemnification under BOT Policy 403, without notice, hearing, or any process whatsoever, in violation of the Fourteenth Amendment. The Michigan Legislature has itself determined that discipline of this class of elected constitutional officer demands process: MCL 168.293 conditions even removal from office on a substantive showing, written notice of the charges, and a public hearing conducted personally by the Governor. Defendants' parallel sanctions regime extinguishes privileges of the very same office with less process than Michigan law guarantees for the identical subject matter; it provides none.

147. As applied, the 2026 Code has been enforced against Dr. Vassar continuously since May 24, 2026. On its face, the Code's signature requirement, speech commitments, automatic-

sanction provisions, and amendment-recusal mechanism are unconstitutional in all or substantially all of their applications.

148. The damages sought under this Count rest only on Defendants' non-legislative conduct: the drafting and circulation of the 2026 Code outside any committee process, and the administrative implementation of its automatic sanctions against Dr. Vassar by Chair Scott, by Defendant Fletcher as the officer administering Board actions, by the University administration President Guskiewicz then led, and by others, including the revocation of her Mackinac Policy Conference credentials. The adoption vote itself is alleged as context and as evidence of purpose, not as a basis of individual liability.

149. Dr. Vassar is suffering an ongoing violation of federal law. Against the official-capacity Defendants, Plaintiff seeks a declaration that the 2026 Code's signature requirement, speech commitments, automatic sanctions, indemnification-stripping provision, and amendment-recusal mechanism are unconstitutional; an injunction against their enforcement; rescission of all sanctions imposed on her under the Code; and restoration of the privileges, credentials, and functions withdrawn.

**COUNT VI**

**Prospective Declaratory and Injunctive Relief**

**(Against the Chair, the Members of the Board of Trustees, and the Secretary and Chief of Staff to the Board in Their Official Capacities)**

150. Plaintiff realleges and incorporates the foregoing paragraphs.

151. Dr. Vassar remains an elected trustee through 2029 and continues to suffer ongoing violations of federal law: the continued denial of her committee assignments and trustee privileges, continued interference with her indemnification, and the continued enforcement of the

2026 Code's automatic sanctions. Her committee exclusion continues today without any Board resolution behind it: the corrective-actions attachment expired by its own terms on December 31, 2024, and no vote has replaced it.

152. The official-capacity Defendants are the officers with authority to implement the relief sought. Plaintiff seeks prospective relief requiring them to restore her committee assignments, benefits, and privileges of office; to cease interference with her indemnification under BOT Policy 403 going forward; to rescind all sanctions imposed under the 2026 Code and refrain from enforcing its Statement of Acknowledgment requirement; and to afford her a name-clearing hearing. Plaintiff seeks no retrospective monetary relief from the State.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and award: (a) compensatory damages against the individual-capacity Defendants, jointly and severally, in an amount to be determined at trial, for reputational harm, emotional distress, unreimbursed legal expenses, and the other injuries alleged; (b) punitive damages against the individual-capacity Defendants; (c) declaratory and prospective injunctive relief as set forth in Counts V and VI; (d) reasonable attorney fees and costs under 42 U.S.C. § 1988; (e) pre- and post-judgment interest as allowed by law; and (f) such other relief as the Court deems just.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

## INDEX OF EXHIBITS

**Exhibit 1**: March 2024 Resolution Package (Attachments A through D and Executive Action Summary).

**Exhibit 2**: 2026 Code of Ethics and Conduct, as adopted May 17, 2026.

Respectfully submitted,

MARKO LAW, PLLC
By: /s/ Jonathan R. Marko
Jonathan R. Marko (P72450)
1300 Broadway Street, Fifth Floor
Detroit, Michigan 48226
Telephone: (313) 777-7529
Email: jon@markolaw.com
Lead Co-Counsel for Plaintiff Dr. Rema Vassar

MAVACY PLLC

By: /s/ Martin T. Shepherd
Martin T. Shepherd (P65331)
801 W. Ann Arbor Trail, Suite 230
Plymouth, Michigan 48170
Telephone: (248) 469-4086
Email: mshepherd@mavacy.com
Co-Counsel for Plaintiff Dr. Rema Vassar
Dated: October 20, 2026